UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| JOE WEST, TOM HALLION, GERRY DAVIS, LARRY VANOVER and JERRY LAYNE<br>Plaintiff,<br><br>v.<br><br>THE AMERICAN LEAGUES AND NATIONAL LEAGUES OF PROFESSIONAL BASEBALLCLUBS RETIREMENT INCOME PLAN FOR UMPIRES ("PLAN"), and<br><br>RETIREMENT COMMITTEE OF THE AMERICAN LEAGUES AND NATIONAL LEAGUES OF PROFESSIONAL BASEBALL CLUBS RETIREMENT INCOME PLAN FOR UMPIRES ("RETIREMENT COMMITTEE")<br><br>Defendants. | * * * * * * * * * * * * * * * * * * * * * * /  | Case No. |

**COMPLAINT**

Now come the Plaintiffs, by their attorneys, MARK DEBOFSKY of DEBOFSKY LAW and PAUL B. HOLMES of WILLIAMS BARBER MOREL; and complaining against the PLAN and RETIREMENT COMMITTEE under the PLAN, they state:

***Nature of Action***

1. This matter relates to the miscalculation and resulting underpayment of the pension benefit payable to each Plaintiff under the Plan after their recent retirements as Major League Baseball ("MLB") umpires. Plaintiffs allege the existence of a legal defect in the 2005 Basic Benefit Table under Column B of Schedule A to the Plan, which defect must be equitably reformed pursuant to 29 U.S.C. § 1132(a)(3), so that proper lawful benefit amounts can be determined and

paid under the reformed Plan document. Plaintiffs also allege a misapplication of Plan terms in calculating Plan benefits, including but not limited to, a failure to provide actuarial increases to plan benefit amounts when the commencement of plan benefits is deferred beyond the umpire's normal retirement age under the Plan.

***Jurisdiction and Venue***

2. This Court has jurisdiction over the parties and the subject matter of this action pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA") as the benefit at issue is provided under an employee pension benefit plan governed by ERISA. Accordingly, jurisdiction is proper pursuant to 29 U.S.C. §§ 1132(e)(1) and (f).

3. The Court also has jurisdiction pursuant to 28 U.S.C. § 1331 since Plaintiffs' claims arise under the laws of the United States.

4. Venue is proper in this District pursuant to 29 U.S.C. § 1332(e)(2) and 28 U.S.C. § 1391 since the Plan is administered and maintained in this District.

***The Parties***

5. The Plan is a "defined benefit pension plan" as defined under 29 U.S.C. § 1002(35) of ERISA. The Plan is sponsored by the Office of the Commissioner of Baseball ("Commissioner") for the benefit of MLB umpires. The pension benefits payable under the Plan are collectively bargained between the Commissioner and the Major League Baseball Umpires Association ("Union"), the union representing MLB umpires.

6. The Plan is also an employee pension benefit plan as defined by 29 U.S.C. § 1002(2)(A) and subject to the requirements of ERISA and the Internal Revenue Code (26 U.S.C.). A true and correct copy of the Plan is attached hereto and by that reference incorporated herein as Exhibit "A."

7. The Plan is intended to be tax-qualified under Section 401(a) of the Internal Review Code ("Code").

8. Upon information and belief, the Retirement Committee is a group of current and former MLB executives appointed by the Commissioner. The Retirement Committee is a "named fiduciary" of the Plan under ERISA and the "plan administrator" of the Plan under 29 U.S.C. § 1002(16). The Retirement Committee has authority to interpret and apply the provisions of the Plan, but only to the extent such terms are consistent with applicable law. All actions, decisions and interpretations of the Retirement Committee must be performed in a uniform and nondiscretionary manner. Plan § 2.2. The members of the Retirement Committee have varied from time to time over the years Plaintiffs were participants in the Plan. The Retirement Committee also has the authority, under the Plan, to adopt Plan amendments on behalf of the Commissioner.

9. Plaintiffs are recently retired MLB umpires, all of whom had at least 25 years of service as professional baseball umpires prior to their retirement, and who had more than twenty (20) years of credited service under the Plan. Plaintiffs were all participants in the Plan as defined by 29 U.S.C. § 1002(7) throughout their MLB careers. Although two of the Plaintiffs have received their pension benefit in a lump-sum payment from the Plan which purported to be the full present value of their accrued pension benefit, each such distribution amount was paid in an amount that was far less than the full benefit each Plaintiff earned under the Plan. As such, those two Plaintiffs continue to be participants entitled to pursue their fully earned benefit under the Plan. Similarly, the three other Plaintiffs are currently receiving a monthly pension benefit amount, but the amount being paid is far less than the full benefit earned by such Plaintiff under the Plan.

The Union is not a party to this lawsuit. Neither is the Commissioner, which is the sponsor of the Plan. However, since the pension benefits under this Plan are subject to collective bargaining

between the Commissioner and the Union, the Commissioner does not have unlimited authority or unlimited discretion to set the pension benefit levels, forms of payment, commencement dates for pensions or other collectively bargained aspects of the Plan and must act in accordance with the collectively bargained terms and conditions of the Plan. Further, the Commissioner does not have unlimited authority or unlimited discretion to make substantive amendments to the Plan without the acquiescence of the Union. All proposed Plan amendments which impose substantive changes to Plan benefits must be delivered to and approved by the Union. Further, all substantive changes to Plan benefits must be consistent with the collective bargaining agreements under Section 10.1 of the Plan.

10. Prior to filing this lawsuit, each Plaintiff administratively exhausted all pre-litigation appeals required by the Plan or because their claims were substantially similar to other claims that had been unsuccessfully appealed, further appeals would have been futile.

***Overview of the Umpires Pension Plan***

11. The Plan provides for payment of a monthly pension benefit to eligible MLB umpires after they retire, but payment is deferred until they elect to commence receiving their pension payments.

12. The Plan provides one normal form of payment to <u>unmarried</u> umpires when they elect to commence their pension and a different normal form of payment to <u>married</u> umpires when they elect to commence their pension. The normal forms of payment were changed under the Plan effective January 1, 2013. The ensuing normal forms of payment provided higher monthly pension amounts because those forms of payment did not require a ten-year certain death benefit "insurance" reduction.

13. The Plan allows an umpire to waive the normal form of payment applicable to them, and to select a different optional form of payment instead. The amount of any benefit paid in an optional form of payment is adjusted up or down, to be actuarially equivalent to the benefit amount payable in the normal form of payment.

14. The Plan allows an umpire to elect to receive the present value of his future monthly pension payments in an immediate lump-sum payment if he commences his pension after January 1, 2020 and selects this option. Two of the Plaintiffs chose the lump-sum payment option. The other three Plaintiffs are receiving monthly pension payments.

15. The form of payment is a critical aspect of this dispute as the dollar amount of an umpire's monthly pension may be higher when paid in an optional form of payment or when the normal form of payment changes under the Plan.

16. The Plan is required to provide accurate projected benefit amount information to the umpire in an annual benefit statement, and accurate current benefit amount information in any distribution request package when the umpire is considering election of the commencement of his pension benefit under the Plan.

17. Inaccurate benefit statements and/or distribution request packages were provided to certain of the Plaintiffs and to other umpires from time to time as explained further herein.

18. The pension benefit amounts under the Plan are determined by reference to an applicable Benefit Table under the Plan document rather than pursuant to a traditional pension benefit formula which might be based on years of service, average monthly compensation and/or other metrics. The Plan has nine different Benefit Tables because the original Benefit Table from 2000-2004 was replaced with a new Benefit Table for 2005-present, and that Benefit Table was

supplemented with additional Benefit Tables in 2010, 2013, 2015, 2020, etc. In most cases, an umpire is only covered by one or two Benefit Tables at any point in time.

19. The primary Benefit Table in this dispute is the Benefit Table under Column B of Schedule A, which is tied to the maximum benefit allowed under Code Section 415 in 2005 at each commencement age. This is very important because the rules of Code Section 415 in 2005 are part of the Plan's design for that Benefit Table.

20. The Benefit Table at Column B was effective January 1, 2005 and is still effective today. All regular Benefit Tables added to the Plan after 2005 have maximum annual pension payment amounts of $170,000 per year commencing at age 62, with no increases to the pension amount if an umpire commences his pension after age 62. There are several special Benefit Tables that apply only to small groups of umpires who commenced their pension during a limited (early retirement incentive window) period of time. Those special Benefit Tables may have maximum benefit amounts which are slightly higher than $170,000 at age 62. The Benefit Tables added to the Plan after 2005 all focus on age 62, as the age at which the maximum pension amount under the Plan has been reached.

21. The 2005 Benefit Table is unique in that it provides greater benefits for pension payment commencements after age 62. It is also unique in that it provides benefit amounts which are equal to the maximum benefit amount set forth in Code Section 415 in 2005. Locking into the 2005 maximum benefit amount under Code Section 415 is matter of plan design. The maximum benefit amount under Code Section 415 increases over time with the cost-of-living, but irrespective of increases in the maximum payouts permitted under Code Section 415, the Plan benefits under the Column B Benefit Table were capped at the 2005 maximum benefit amount under Code

Section 415 in 2005. Hence, the Code is not setting the benefit amounts in Column B; the Plan design is setting these benefit amounts.

22. The Plan provides that an umpire who commences his pension after 2004 (who did not retire prior to 2005) will receive the greater of (i) the benefit under the 2005 Benefit Table, and (ii) the benefit under the other Benefit Table in effect on his date of retirement. As such, umpires who commence their pension after age 62 will generally receive a greater benefit under the 2005 Benefit Table than they would receive under any Benefit Table added to the Plan after 2005. To the extent the pension benefits in the applicable Benefit Tables are payable in different forms of payment, the benefit with the greater actuarial value would be payable.

23. This "greater of" two Benefit Tables benefit promise was not mentioned (i) in any Summary Plan Description ("SPD") disseminated to participants under the Plan, (ii) in the actual text of the Plan document from 2005-present, or (iii) in any distribution request forms provided to participants. Instead, the more generous benefit rights under the 2005 Benefit Table after age 62 are buried in the footnotes to Schedule A of the 2005, 2013 and 2022 Plan Restatements, none of which were provided to Plan participants.

24. In essence, the Plan's maximum benefit amount is the amount determined under the 2005 Benefit Table for many long-tenured umpires who are just now retiring and commencing their pensions, twenty years later.

25. A Plan participant must complete at least 20 years of credited service to receive the full benefit amount set forth under any Benefit Table under the Plan. Each Plaintiff easily met this requirement, which is not at issue in this dispute.

26. The Plan's promise of paying the "greater of" the benefits under two different Benefit Tables is not set forth in (i) the Plan documents, (ii) the SPDs, or (iii) the distribution request forms provided to umpires before they elect to commence their pension.

27. The 2005 Benefit Table under Column B relates to the 2005 Plan Restatement and 2005 collective bargaining agreement, but the actual 2005 Benefit Table was mysteriously not added to the Plan document until January 1, 2010, by the Sixth Amendment to the 2005 Plan Restatement. However, the Committee started applying the Benefit Table under Column B (adopted in 2010) to participants on January 1, 2005, five years before it was formally adopted under the Plan. Plaintiffs refer to this as the 2005 Benefit Table here to avoid confusion with the seven other Benefit Tables adopted later, despite its mysterious origin.

28. The Committee was aware of the Column B Benefit Table in 2005 even though it was not added to the Plan document until 2010, and was not attached to the 2005 Plan Restatement or 2005 collective bargaining agreement as was the standard practice. The Benefit Table under Column B is unlawful because it contains reductions in accrued benefits from ages 62-65, which violates 29 U.S.C. § 1054(g), which prohibits plan amendments that decrease or eliminate a participant's accrued benefit.

29. The 2005 Benefit Table is also problematic because it only includes benefit amounts for participants <u>who elect a form of payment which includes a ten-year certain feature, which are very few</u>. The benefit amounts promised by the Plan for the most common forms of payment are noticeably higher, but those higher benefit amounts are not mentioned in any Benefit Table. See the table at Paragraph 45 below as an example.

30. During the administrative review process for Plaintiffs West, Hallion and Davis, the Committee was asked to explain why this controversial Benefit Table was not added to the

2005 Plan document or 2005 collective bargaining agreement, but the Committee did not explained its actions.

31. Nor did the Committee disclose during the administrative review process who drafted the Benefit Table under Column B, when it was first drafted, when or even whether it was provided to the Union for the Union's review and approval, or when it was first provided to the Committee and by whom.

32. The Committee claims that the Benefit Table under Column B (from 2010) was somehow included in a 2005 Summary Plan Description ("SPD"), but the Committee could not verify when the purported 2005 SPD was prepared or disseminated to umpires, if at all.

33. The Committee has not provided any explanation for the reduction in accrued benefits other than that the Benefit Table under Column B "appears to depict the benefit table contemplated by the Commissioner and Union in their 2005 Collective Bargaining Agreement." The Committee has not provided any evidence that the Benefit Table under Column B was ever provided to the Union for review and approval prior to 2010.

34. The unusual circumstances described in Paragraphs 27-33 above deceived Plaintiffs and other umpires who worked for MLB on or after January 1, 2005 because the information was not shared with Plan participants.

***The "Broken" Benefit Table from 2005 (Column B)***

35. The 2005 Benefit Table (from 2010) is set forth below in relevant part, starting with benefit amounts payable for umpires commencing their pension from ages 62-70:

| Age | Normal Form for Unmarried Umpire Single Life Annuity With Ten-Years Certain |
|---|---|
| 62 | $159,325 |
| 63 | $158.140 |
| 64 | $156,538 |
| 65 | $154,968 |
| 66 | $166,927 |
| 67 | $179,926 |
| 68 | $194,447 |
| 69 | $210,179 |
| 70 | $227,687 |

36. Plaintiffs characterize the above table as the "broken" 2005 Benefit Table because accrued benefit amounts decrease from age 62 to age 65. The impermissibility of such reductions is discussed in Paragraphs 37 to 55 below. The benefit amounts from age 66-70 are also in dispute, addressed in Paragraphs 60 to 61 below.

37. The amounts set forth in the 2005 Benefit Table under Column B are the same amounts that would be paid under a 100% joint and survivor annuity with a ten-year certain feature (subject to the corrections of such amounts described herein). As such, the flaws in this Benefit Table also adversely impact married umpires who elect a 100% joint and survivor annuity (with a ten-year certain feature) form of payment.

38. The genesis of the "broken" 2005 Benefit Table in Column B was Subsection 5.1(a) of the 2005 Plan Restatement, which was added to the Plan effective January 1, 2005, and which reads as follows:

> Section 5.1. Basic Benefit. (a) Subject to the provisions of this Article V, with respect to each Participant who is actively employed as an Umpire on or after January 1, 2005 and whose employment as an Umpire thereafter terminates (whether by resignation, layoff, discharge, death or any other reason), the amount of such Participant's Basic Benefit under the Plan, shall equal the maximum benefit allowable under Section 415 of the Code as of January 1, 2005. If such maximum benefit allowable under Section 415

> increases after January 1, 2005, there shall be no increase to the Participant's Basic Benefit under the Plan. (Emphasis added.)

39. The maximum benefit allowable under Section 415 of the Code in 2005 was $170,000, for benefits commencing from ages 62-65. However, that maximum benefit is paid in the form of a single life annuity, without a ten-year certain death benefit feature.

40. The benefit amounts set forth in the Column B Benefit Table illustrated in Paragraph 35 above, are noticeably lower than the $170,000 maximum benefit amount under Code Section 415 promised in Subsection 5.1(a) of the Plan. See the table at Paragraph 45 below.

41. Setting the new benefit level at the Code Section 415 dollar limit for 2005 was good news and bad news for the umpires, but mostly bad news. The good news was that the maximum benefit amount in 2005 was $170,000/year at age 65, a noticeable increase from the maximum benefit amount at age 65 under the 2000-2004 Benefit Table. It should be noted, however, that the 2000 Benefit Table was effective only one year before the maximum benefit under Code Section 415 was increased significantly under federal law. The incremental increase in the maximum benefit from 2004 to 2005 was only $10,000 per year. The bad news was that Code Section 415 "freezes" the benefit amount at $170,000 for commencements at age 62, 63, 64 and 65. Hence, umpires do not receive "the time value of their money" if they defer the commencement of their pension for any time period between ages 62-65. This type of benefit "forfeiture" (i.e. loss of the time value of their money) is also discussed in another context, at Paragraphs 76 to 79 below.

42. To make things worse, the Commissioner reduced the benefit amounts at every commencement age in the Column B Benefit Table assuming that every umpire would elect to receive his benefit with a ten-year certain death benefit feature. In other words, there were no Benefit Tables disclosing the higher benefit amounts payable under the most common forms of payment.

43. A ten-year certain death benefit feature assures that ten years of pension payments will be made, even if the umpire dies during the first ten years of his pension payout period. Without that feature, monthly payments cease upon death (unless the form of payment chosen includes a surviving spouse feature, which is commonly elected by married umpires as required by 29 U.S.C. § 1055 absent spousal consent).

44. Stated differently, the ten-year certain death benefit feature is only attractive (if at all), to unmarried umpires (in poor health).

45. The magnitude of the ten-year certain "insurance premium" is illustrated by comparing the benefit amounts set forth in the 2005 Benefit Table under Column B (from Paragraph 35 above) to the noticeably higher benefit amounts that are payable if an umpire choses to receive a common form of payment, and <u>not</u> to receive a ten-year certain feature (i.e. not to buy the death benefit insurance). See chart below:

| Age at Commencement | Single Life Annity Amount With Ten-Years Certain | Single Life Annity Amount Without Ten-Years Certain |
|---|---|---|
| 62 | $159,325 | $170,000 |
| 63 | $158,140 | $170,000 |
| 64 | $156,538 | $170,000 |
| 65 | $154,968 | $170,000 |
| 66 | $166,927 | $183,169 |
| 67 | $179,926 | $197,526 |
| 68 | $194,447 | $213,221 |
| 69 | $210,179 | $230,457 |
| 70 | $227,687 | $249,437 |

46. The cost of the ten-year certain benefit feature is steep. An umpire's annual pension would be reduced to a noticeably lower amount for the remainder of his life, to pay for ten years of death benefit insurance. The cost increases from $10,675 per year ($170,000-$159,325) for

pensions commencing at 62, to $15,032 per year ($170,000-$154,968) for pensions commencing at age 65, to more than $20,000 per year at age 69 and age 70.

47. The Plan did not include any benefit tables to illustrate to the umpires how much pension they were accruing each year if they elected a more common form of payment, such as a single life annuity (without the ten-year certain feature) or a 100% joint and survivor annuity (without the ten-year certain feature). (The differences in the annual pension amounts for the for the two forms of payment are set forth in the table contained in Paragraph 45).

48. Further, the Plan did not provide any increases in the benefit amounts after age 62 in the seven Benefit Tables adopted after 2005. See partial excerpts from the Benefit Tables in Columns E, F and I below:

| Benefit Tables Under Columns E, F and I | |
|---|---|
| Age | Single Life Annuity Without Ten-Years Certain |
| 62 | $170,000 |
| 63 | $170,000 |
| 64 | $170,000 |
| 65 | $170,000 |
| 66 | $170,000 |
| 67 | $170,000 |
| 68 | $170,000 |
| 69 | $170,000 |
| 70 | $170,000 |

49. The 2005 Benefit Table (excerpts shown at Paragraphs 35 and 45 above) is misleading to umpires, because it does not disclose the higher benefit amounts payable if an umpire chooses to opt-out of the ten-year certain death benefit feature, and elects instead to receive his pension in the form of a single life annuity (with no ten-year certain feature) or 100% joint and survivor annuity (with no ten-year certain feature). Umpires never saw their higher pension benefit

amounts under those most popular forms of payment during their entire working careers. Those much more common pension benefit amounts are not disclosed until they retire and request a distribution package. Even then, umpires did not receive accurate dollar amounts in many instances, with examples described below.

50. The umpires were led to understand the reduced pension amounts in the Benefit Table under Column B were the maximum pensions they could ever earn or receive because that is the only Benefit Table they ever saw which included benefit increases after age 62. As such, they were not aware that their pension benefits were being miscalculated by the Committee when they received distribution request packages with incorrect benefit amounts, which are described below.

***The "Broken" 2005 Benefit Table (Column B)***
***Violates Section 411 of the Internal Revenue Code***

51. The fiduciary requirements of ERISA (29 U.S.C. § 1104(a)(1)(D)) require the Committee to follow the terms of the Plan, but only to the extent such terms are consistent with lawful requirements.

52. The Benefit Table in Column B as drafted is unlawful since it does not comply with the Tax Code and therefore cannot be enforced by the Committee.

53. The reductions in the benefit amounts in the Column B Benefit Table from ages 62-65 are impermissible reductions in a participant's accrued benefit based on an increase in age, which is a violation of Sections 204(b)(1)(G) and (H) of ERISA, Sections 411(b)(1)(G) and (H) of the Code and Treasury Regulation Section 1.411(b)-1(d)(3).

54. The Committee told the Plaintiffs (during the administrative review process) that the reductions in accrued benefits were permissible because the age 62-65 dollar amounts in Column B are all actuarially equivalent to $170,000. However, because the dollar amounts in this

table for participants who might elect the form of payment covered by the table decreased from ages 62-65 because of an increase in their age, that constituted an impermissible reduction in accrued benefits.

55. As such, the "broken" Benefit Table from Column B is legally defective and cannot be enforced in its present state. In essence, this aspect of the Plan's design is defective, and must be reformed.

***Failure to Pay Benefits According to the Form of Payment Elected by an Umpire***

56. The Committee also disregarded the fact that the Column B Benefit Table only applied to a participant who elected a form of payment which included the ten-year certain feature, which is very rare. As a result, the Committee paid some umpires under the Benefit Table in Column B, even though they elected a form of payment which did not include a ten-year certain feature. As such, those umpires should have been paid under an alternative table (with no ten-year certain feature reduction) such as the alternative benefit table illustrated in Paragraph 45 above. The higher amounts earned under the alternative table are payable for the remainder of a participant's life.

57. To further compound the errors, the Committee continued to utilize the unlawful Benefit Table in Column B after 2012, when the normal forms of payment under the Plan were changed and the ten-year certain feature was no longer included in the normal forms of payment under the Plan for married or unmarried umpires. See Section 6.3 of the 2013 Plan Restatement, and the Normal Form of Payment Section of the 2014 SPD.

***Improper Calculation of Optional***
***Form of Payment Benefit Amounts***

58. From 2005 to 2012, the ten-year certain feature was included in the normal forms of payment for both unmarried and married umpires. However, most umpires elected to receive their pension benefit in an optional form of payment during that time period, which did not include a ten-year certain feature.

59. As such, those umpires should have received the higher benefit amounts payable under the optional form of payment they elected.

60. For example, a married umpire who elected to receive his pension in the form of a 100% joint and survivor annuity without the ten-year certain feature, should have received the benefit amount illustrated in the right-hand column of the table below:

| Age at Commencement | Normal Form for Married Umpire (2005-2012) 100% Joint and Survivor Annuity With Ten-Years Certain | Optional Form #1 for Married Umpire (2005-2012) 100% Joint and Survivor Annuity Without Ten-Years Certain |
|---|---|---|
| 62 | $159,325 | $170,000 |
| 63 | $158,140 | $170,000 |
| 64 | $156,538 | $170,000 |
| 65 | $154,968 | $170,000 |
| 66 | $166,927 | $183,169 |
| 67 | $179,926 | $197,526 |
| 68 | $194,447 | $213,221 |
| 69 | $210,179 | $230,457 |
| 70 | $227,687 | $249,437 |

61. Actually, the dollar figures from ages 66-70 in the "broken" Column B Benefit Table in the left-hand column above are inaccurate (and too low). Those benefit amounts are supposed to be actuarially equivalent to the maximum benefit amounts under Code Section 415 in 2005 at each commencement age, which are shown above in the right-hand column. The broken

Column B Benefit Table amounts from age 66-70 in the left-hand column are understated in this regard.

62. It should be further noted that neither of the benefit tables illustrated above (for married umpires) are set forth in any benefit table under the Plan. These amounts are derived from Subsection 5.1(a) of the 2005 Plan Restatement and Code Section 415, as it existed in 2005.

63. The normal forms of payment (after 2012) did not include a ten-year certain feature, and those normal forms of payment remain in effect today. So, no umpires commencing a pension after 2012 should receive the lower pension benefit amounts from ages 62-70 in Column B, like those illustrated in Paragraphs 35, 45 and 60 above, unless they affirmatively elect to receive an optional form of benefit which includes a ten-year certain feature. None of the Plaintiff umpires elected a ten-year certain feature, yet some of their pension calculations included reductions as if they elected such a feature.

64. The Committee failed to recognize these changes in the normal forms of payment in some circumstances and also failed to pay the higher benefit amount due under the new normal forms of payment in multiple instances after 2012.

65. Plaintiffs West, Davis, Vanover and Layne were adversely impacted by this Committee failure.

66. Plaintiffs West and Vanover took lump-sum payouts, but their lump-sum amounts were based on the wrong form of payment benefit amounts.

67. Plaintiffs West and Vanover subsequently received supplemental payments from the Plan, which did not fully correct all calculation errors described herein. The Committee provided no explanation as to why the supplemental payments were made or how they were

calculated. This is not how a Plan fiduciary should communicate with Plan participants who have been underpaid.

68. Plaintiff West clearly did not receive a full corrective amount due to a faulty application of another provision in the Plan, which applies solely to him, which is discussed in Paragraphs 121 to 136 below.

***The Committee's Improper Deferral of Attained Ages When Calculating Pension Benefits***

69. All the Benefit Tables under the Plan, including the Benefit Table at Column B, refer to a pension benefit payable based on the participant's attained age at pension commencement. A participant's attained age at pension commencement is the basis upon which the maximum benefit amount under Code Section 415 is determined, and this maximum benefit amount is the amount promised by the Plan under Subsection 5.1(a) of the 2005 Plan Restatement.

70. Notwithstanding the foregoing in Paragraph 69, the Committee implemented an "administrative practice" of reducing a participant's attained age at his pension commencement date when calculating pension benefits under the Plan.

71. In calculating an umpire's pension benefit under the 2005 Benefit Table in Column B, the Committee routinely ignored the actual age of the umpire on his pension commencement date and provided the lower benefit amount under the Column B table as if the umpire was one year younger than he actually was at pension commencement.

72. The administrative practice caused various umpires to receive a lower pension benefit amount than was payable under the Plan.

73. The administrative practice implemented by the Committee is not set forth in any Plan document, SPD, annual participant benefit statement or ultimate distribution request package. It is impossible for a participant to know his pension amount was calculated based on an incorrect

age at commencement without hiring a pension actuary and ERISA lawyer, and obtaining Plan documents through a formal claim process under ERISA. Even then, the errors are not obvious because the Committee did not provide a calculation sheet showing how the benefit amount was derived. None of the Plaintiffs received such a sheet.

74. The administrative practice was not uniformly applied. In some instances, the Committee deferred recognizing a participant's birthday until the next following January 1 after his birthday occurred, or the Committee applied a participant's age as of his last birthday prior to the January 1 of the year of pension commencement. Either way, the practice is inconsistent with the express terms of the Plan, including the utilization of the maximum benefit amounts under Code Section 415 in 2005 at each attained age, upon which the 2005 Plan benefits are based. The inconsistent application of such an administrative practice is a separate legal problem.

75. The Committee tried to justify its failure to recognize an umpire's actual attained age at pension commencement when calculating pension benefits during the administrative review process by reference to an unreasonable interpretation of the "Normal Retirement Date" and "Deferred Retirement Date" under the Plan. An umpire's Normal Retirement Date or Deferred Retirement Date has no bearing on his attained age at pension commencement. Further, the definitions of the "Normal Retirement Date" and Deferred Retirement Date under the Plan are circular and unusable. A deferred retirement date is always later than the normal retirement date. Otherwise, it is not a deferred retirement date. The Committee ignored this simple premise in an attempt to justify their unreasonable practice.

***Failure to Provide Actuarial Increases for Pensions Commencing After an Umpire's Normal Retirement Age***

76. The Plan provides that an umpire's pension benefit will be actuarially increased if he defers the commencement of his benefit until after his Normal Retirement Date. See Plan Section 6.2(a)(iii)(B).

77. This actuarial increase is required to avoid a prohibited forfeiture of a participant's accrued benefit at his normal retirement age under Section 411 of the Code, including Section 411(c)(3). See also, for example, IRS Revenue Ruling 81-140.

78. The reason for this rule under the Code and this provision under the Plan is that a participant's accrued benefit at his normal retirement age must be nonforfeitable and cannot be reduced thereafter. If a participant defers the commencement of his pension beyond his normal retirement age, the benefit amount must be actuarially increased after his normal retirement age to reflect (i) the time period for which the participant did not take his earned pension payments, and (ii) the reduced life expectancy of the participant going forward when commencing his pension at a later age (i.e. expected reduced payout period). If the actuarial increase is not provided, the participant incurs an impermissible forfeiture of his accrued benefit because he has not received "the time value of his money" on the benefit amount accrued at his normal retirement age.

79. The rules described immediately above are similar to the rules under Social Security applicable to situations where a beneficiary defers the commencement of his or her Social Security retirement benefit beyond their full Social Security retirement age. The benefit amount paid upon the deferred commencement date is actuarially increased for the same reasons as are described in Paragraph 78 above.

80. There is an important exception to this actuarial increase requirement for participants who (i) remain employed with MLB after their normal retirement age, and (ii) timely

receive a fully compliant "suspension of benefits" notice at the time of reaching their normal retirement age. This exception is a primary focus of this dispute and is discussed in considerable detail below.

81. The exception to the actuarial increase requirement mentioned in Paragraph 80 applies only if the following conditions are met:

(i) the participant continues to work for MLB after his normal retirement age

(ii) the participant is provided with a suspension of benefits notice that informs the participant that he will not receive an actuarial increase to his benefit (for deferred commencement) during the period of his continued employment with MLB

(iii) the suspension notice meets all other legal requirements, and

(iv) the suspension notice is timely provided (i.e. during the month following his normal retirement age).

82. As a threshold matter, there is considerable doubt as to whether the Plan contains a valid suspension of benefits provision which applies to umpires working beyond their normal retirement age. First, "normal retirement age" was not defined anywhere in the Plan from 2000 to the present date, which raises the question of how the suspension of benefit rules for continued employment beyond the normal retirement age could be properly applied by the Committee or understood by Plan participants. Second, the Plan refers to a participant's Normal Retirement Date (not normal retirement age) in Section 8.3(b). A participant's Normal Retirement Date under the Plan does not occur until after a participant terminates employment. Hence, this Plan does not expressly allow for the suspension of actuarial increases beyond an umpire's <u>normal retirement age</u>. Further, this type of suspension of benefits (of actuarial increases) is not discussed in Section

8.3(b) of the Plan or in any SPD disseminated to participants, to warn them of the potential loss of significant benefit increases if they continue working for MLB after their normal retirement age. Participants who defer their commencement beyond normal retirement age and do not continue working for MLB after their normal retirement age are entitled to these actuarial increases as there is no suspension of benefits notice exception in those instances.

83. Although normal retirement age and normal retirement date sound similar, they refer to two separate things (one is an age and the other is a date). Under a well-drafted plan document, those terms are not used interchangeably, as they are used for different purposes. The normal retirement age is used for vesting purposes and suspensions of benefits. The normal retirement date establishes the timing of pension payments (along with an early retirement date, a deferred retirement date and a disability retirement date). As such, both terms should be defined in the Plan and used correctly, depending on the Plan provision.

84. Even if Section 8.3(b) of the Plan is interpreted by the Court to include a suspension of benefits (for actuarial increases) provision, other problems described below require the actuarial increases to be provided.

85. Neither the Commissioner nor the Committee have been able to establish that any of the Plaintiff umpires received a timely and fully compliant suspension of benefits notice for this type of suspension (i.e. forfeiture of actuarial increases upon continued employment beyond the normal retirement age).

86. The burden of proof on whether a timely and legally sufficient suspension of benefits notice was provided to a participant rests with the Committee. The Committee cannot impose a forfeiture of the actuarial increases on any participant based solely on the statement (from

one of the administrative claim denial letters) that "compliant suspension notices were routinely provided by the Committee as umpires reached age 55 in the past."

87. Rather, the Committee must provide copies of the actual notices from their files (including electronic files), evidencing the actual content of the notice provided, the date it was provided, and how it was provided (e.g. U.S. mail, FedEx, email or otherwise). At a minimum, this must be done for these five Plaintiffs.

88. None of the five Plaintiff umpires received a suspension of benefits notice when they reached age 55 (or any other age).

89. The Union could not locate any record of such notices being provided to their members in their pension or personnel files. Nor could the Union find any record of any discussions regarding the dissemination of such notices or the loss of actuarial increases when an umpire continues working beyond his normal retirement age.

90. Instead, the Committee provided Plaintiffs with a sample suspension notice from 15-20 years ago which purport to include the content of an actual notice provided to the Plaintiffs when they each reached age 55. The Committee was unable to substantiate that the sample notices were sent to each Plaintiff at that time, or the method of transmission.

91. The Committee has not been able to provide copies of any notices sent to the Plaintiff umpires.

92. Even if the sample notices were provided to all five Plaintiff umpires at age 55, the sample notice does not meet all of the conditions set forth in Paragraph 81 above. Not even close.

93. The sample notice provided by the Committee made no mention of (i) actuarial increases under the Plan or the Code, (ii) the forfeiture of such actuarial increases in the event of continued employment with MLB after normal retirement age, or (iii) that a suspension of benefits

(i.e. actuarial increases) had occurred or was about to occur. The sample notice only mentions that pension payments will not commence until the participant actually retires. There is no mention that the amount of the participant's pension payments will be noticeably less at commencement if he continues working with MLB beyond his normal retirement age.

94. The sample notice provided by the Committee only says that the participant's pension will not begin until he actually retires. The umpires already knew that, and such statement was irrelevant. Being notified that your pension will not commence until you retire is far different than being notified that you will forfeit significant actuarial increases to your pension benefit if you continue working for MLB. As such, the sample notice was intentionally misleading by omission and was not helpful to any notice recipient at all. Tens or hundreds of thousands of dollars in forfeitures were at stake, yet these increases and their potential forfeiture were not mentioned at all.

95. In fact, the sample notice downplays the importance of the notice by describing it as something "the Department of Labor requires," and "you need take no action at this time." In essence, the sample notice is a deceptive invitation to forfeit substantial pension benefit increases, which forfeiture could easily be avoided by leaving MLB and deferring the pension until retirement income is needed.

96. Further, both the sample cover letter and sample notice suggest that further benefits are accruing while the umpire works beyond his normal retirement age. The cover letter states that "you are not eligible to receive the pension benefits <u>that you are currently accruing with the Plan</u> until you terminate from baseball." The notice itself states that "since you have decided to continue working beyond your Normal Retirement Age, your benefit payments will not begin until you actually retire. When you do retire, your benefit will be calculated as of your Deferred Retirement

Date." This latter statement suggests that benefits will continue to increase until the umpire actually retires.

97. In order to be legally sufficient, the notice must meet the requirements of Department of Labor Regulation 29 C.F.R. § 2530.203-3. These regulations are referenced in the sample notice, but neither their content nor import is mentioned. A sample notice recipient would assume the regulations address the delayed commencement of pension payments until retirement, which is the only substantive subject mentioned in the sample notice. The drafter of the sample notice apparently (i) did not understand that the forfeiture of significant actuarial increases was at stake, or (ii) did not want the notice recipient to know that the forfeiture of significant actuarial increases was at stake.

98. It is important to note that a suspension of benefits notice is also required when a participant retires, commences his pension and is then reemployed. That is a <u>reemployment</u> suspension notice which focuses on a cessation of currently monthly payments. The sample notice appears to be a reemployment notice, focusing on the timing of pension payments, not an actuarial increase suspension notice focusing on lost actuarial increases.

99. The regulation requires the notice to provide a description of the specific reason why benefits are being suspended. This requirement implies that the notice will inform the recipient that a suspension of benefits is occurring, and the specific reason why. The sample notice does not mention that a suspension of benefits is occurring. It does not mention that (i) actuarial increases are payable under the Plan and applicable law for deferred pension commencements if not properly suspended, (ii) the notice is a "suspension of benefits" notice, (iii) the actuarial increases will be suspended and not provided if the umpire continues his employment with MLB after his NRA, (iv) the non-payment of actuarial increases constitutes a suspension of benefits, or

(v) the forfeiture can be avoided by leaving MLB and deferring commencement until a later date when you want your pension to commence.

100. The sample notice merely refers to a "postponement of retirement benefit payments," not a reduction in the pension benefit amount. The notice indicates that a recipient umpire cannot commence his pension and receive an MLB salary at the same time, which all umpires know without a notice, because pensions provide post-employment income during retirement.

101. The sample notice refers to continued employment with MLB (the reason for a suspension of actuarial increase benefits) but does not disclose that benefit amounts will be less if employment with MLB is continued than they will be if employment with MLB is not continued. The only consequence of continued MLB employment mentioned in the notice is the delay in pension commencement, which would already have been known.

102. The sample notice is misleading because it failed to inform the recipient of a major loss of additional pension benefits if he continued working for MLB beyond his normal retirement age.

103. The regulation also requires the notice to provide a general description of the plan provision relating to the suspension. The sample notice only states that "Sections 6.2 and 8.3 of the Plan document deal with the timing of the commencement of your benefits." The commencement of the pension benefit is not the subject to be addressed in a compliant notice for an actuarial increase suspension. Suspension of benefit notices are also provided for post-normal retirement age reemployment after a pension commences. That is a different type of suspension, requiring different information in the notice.

104. The sample notice states that these sections of the Plan are enclosed for your reference, but nothing was attached to the sample notice. A copy of Sections 8.3(a) and 8.3(b) would not help the notice recipient, because neither of those sections addresses the potential loss of actuarial increases (i.e. the loss of additional benefits which are not reflected in any Benefit Table).

105. The sample notice does not provide a general description of the Plan's actuarial increase provision in Section 6.2 or the purported suspension of such actuarial increases in Section 8.3(b). In fact, Subsection 8.3(b) of the Plan provides no discussion of any of these concerns and simply refers to Subsection 8.3(a) of the Plan. Section 8.3(a) addresses a completely different reason for suspending benefits (i.e. reemployment with MLB after a pension commences) and a different type of suspension (i.e. delayed commencement, not a loss of actuarial increases).

106. The sample notice was dated 10-6-2011, but the cover letter for the sample notice was dated 6-8-2011. If this sample notice was actually sent with the cover letter, it was sent too early and is void.

107. The regulation also requires the notice to include a copy of the specific plan provision, but the sample notice only mentioned the plan's section numbers; it did not include a discussion of those provisions nor did it attach or recite the specific plan terms.

108. The timeliness of the sample notice (if any notice was actually provided) is also problematic in the following respect: The Committee stated that notices were routinely provided to participants as they attained age 55, but the claimed normal retirement age under the Plan was age 62 (not age 55), at the time these five Plaintiffs reached age 55 (i.e. between 2008-2012).

109. The question of whether the normal retirement age under the Plan was age 55 or age 62 (or possibly age 60) is a fact intensive inquiry because the Plan did not include a definition

of "normal retirement age." Key facts are set forth below on this important issue. If compliant notices were provided at age 55, but the NRA at that time was age 60 or age 62, the notices were untimely and are void.

110. The Plan originally provided in the 1960's and 1970's that the normal retirement age was 55. Back then, it was not uncommon for umpires to retire at age 55 because many Americans did not live past age 65. However, over the years that has changed.

111. The life expectancy of males in the U.S. improved over this time and was approximately age 74 by 1999 (at birth) and age 76 by 2009 (at birth) according to data compiled by the U.S. Centers for Disease Control and Prevention. See, e.g., United States Life Tables, 2023 (National Vital Statistics Reports), available at https://www.verisk.com/4a5bd6/siteassets/iso-claims-partners/blog-material/cdc-life-tables-2023.pdf.

112. The average retirement age for U.S. workers was 62 in 1999, 63 in 2009, and 65 in 2019. See data from the Center for Retirement Research (CRR) at Boston College - https://crr.bc.edu/wp-content/uploads/2025/03/Average-retirement-age.pdf.

113. The retirement age for full Social Security retirement benefits was increased to from age 65 to age 67 (depending on the year of birth) in 1983.

114. As is mentioned above, there has been no definition of "normal retirement age" under the Plan on and after 2000 despite the fact that the Plan was completely restated in 2000, 2005, 2013 and 2022.

115. More than 25 umpires have retired at or after age 60 in the past 25 years. More than 35 umpires have retired after age 55. The five Plaintiff umpires all retired after age 65.

116. All seven (7) Benefit Tables added to the Plan since 2005 use age 62 as the target retirement age, upon which the maximum pension is earned under those tables. The maximum

pension is not earned at age 55 under any of the nine (9) Benefit Tables since 2000. Several of those Benefit Tables were used to provide an early retirement incentive, with one-time increases in the pension benefit (and other financial incentives) to entice umpires to retire by age 62. These numerous financial enticements from 2010 to the present would not have been necessary if umpires were retiring regularly at age 55.

117. The IRS requested the Committee to amend the Plan in 2009 to clarify that the normal retirement age under the Plan was at least age 62. IRS regulations provide a "safe-harbor" for a normal retirement age of 62 or higher. See Treasury Regulation Section 1.401(a)-1(b)(2), which was promulgated in 2007. Normal retirement ages prior to age 62 in a tax-qualified pension plan are subject to additional IRS scrutiny. The tax qualified status of the Plan was at issue over this subject. The Committee convinced the IRS that age 55 was a typical retirement age for umpires in 2009, but did not provide any actual retirement age data to the IRS.

118. The IRS asked the same question about the normal retirement age in 2014. The Committee then admitted (through legal counsel) that the de facto normal retirement age under the Plan was age 62, in formal communications with the IRS. The Committee used that admission to convince the IRS that no formal plan amendment was needed, because the Plan was already following an age 62 normal retirement age.

119. Upon information and belief, the Commissioner did not want to expressly admit that the NRA had increased to age 62 at that time by adopting a formal Plan amendment because that would require the Committee to issue new suspension of benefit notices at age 62 and trigger the exposure for actuarial increases it is now facing.

120. Since the normal retirement age was 62, not 55, long before the admission to the IRS in 2014, any notice provided to a Plaintiff umpire (if any) was provided 7 years too soon,

causing the notice to be untimely under the regulations, and void. Actuarial increases do not require any noticeable additional funding. The pension assets not paid at the normal retirement age continue to be invested until the pension commences.

***Improper Calculation of Code Section 415 Benefit Limit for Lump-Sum Payouts***

121. In a letter dated March 27, 2023, the Committee admitted to Plaintiff West that it had miscalculated his lump-sum benefit amount under the Plan. According to that letter, the incremental amount owed to Plaintiff was $144,019.76 plus interest. The letter did not explain the error made or how the adjustment was calculated, but on information and belief, it was due to one of the errors described above.

122. Notwithstanding the corrected benefit amount described in paragraph 115 above, the Committee indicated that the Plan would only pay Plaintiff West an additional $10,535.19, because that (much lower) incremental amount would bring Plaintiff West to the maximum lump-sum benefit allowed to be paid under Code Section 415 in the year of the initial distribution (i.e. 2022).

123. On April 26, 2023, Plaintiff West (through counsel) sent a follow-up letter to the Committee to ascertain the basis of its calculation of the maximum lump-sum benefit allowed under Code Section 415. In that letter, Plaintiff West reminded the Committee that Section 5.7(b) of the Plan (dealing with the Code Section 415 rules) had been amended on September 16, 2014, effective as of January 1, 2013, as follows:

"Section 5.7(b) of the Plan is amended to add the following to the end thereof:

> Compensation shall not reflect compensation for a year that is in excess of the limitation under Code Section 401(a)(17), <u>as adjusted pursuant to Code Section 415(d), Treasury Regulation Section 1.415(d)-1(a) and Treasury Regulation Section 1.415(b)-1(a) ($255,000 for 2013)</u>" (Emphasis added).

124. The April 26, 2023 letter went on to remind the Committee that the highlighted language of this Plan amendment clearly adopted the cost-of-living adjustment (i.e. increase) provisions set forth in Treasury Regulation Section 1.415(d)-1(a)(2), allowing the Plan to increase Plaintiff's final average compensation for 2019-2021 (the three final years of employment in which compensation was received), in calculating the maximum lump-sum amount permitted under Code Section 415, because the payout was not made until late 2022. It seemed clear to Plaintiffs' counsel that the Committee had failed to include that one-year cost-of-living increase to the final average compensation in their calculation of the maximum lump-sum amount permissible under Code Section 415 for Plaintiff West.

125. According to Plaintiff's actuary, the actual Code Section 415 limit (properly calculated with the COLA adjustment to his final average compensation included) for Plaintiff was much greater and allowed the Plan to pay Plaintiff West the full corrective amount of $144,091.76, plus interest.

126. On June 6. 2023, the Committee responded to Plaintiff's April 26, 2023 request for a corrected calculation of Plaintiff's maximum lump-sum amount under the Code. In that letter, the Committee declined to follow the clear language in (and intent of) the 2014 Plan amendment cited above. The Committee referred to adjustments for delayed retirement in their response rather than adjustments for cost-of-living increases. Plaintiff's April 26, 2023 letter was crystal clear in referring to cost-of-living adjustments, as the Plan amendment only impacts cost-of-living adjustments.

127. In essence, the Committee decided to ignore its own Plan amendment which could not have any other purpose than to add cost-of-living adjustments (increases) to Plaintiff West's final average compensation amount, to reflect an increase in the cost-of-living from 2021 (year of

retirement) to 2022 (year of payment). These permissible adjustments are intended to protect participants who are subject to the average compensation prong of the Section 415 benefit limits, from forfeiting earned benefits. The dollar amount prong of the Section 415 benefit limits is adjusted for cost-of-living increases automatically under the Code, and this regulation merely levels the playing field for participants subject to the average compensation prong of the Section 415 limits.

128. The cited regulation describes two sets of adjustments to the Section 415 limit, one for increases to the dollar limit (first prong) and a second for increases in the final average compensation amount (second prong). Section 5.7 of the Plan already included the adjustments to the first prong before the 2014 amendment was adopted. As such, the only plausible reason for the 2014 Plan amendment was to add the COLA adjustment (i.e. cost-of-living adjustment to the final average compensation amount) to the second prong of the limit. Note the key words "as adjusted pursuant to."

129. Notwithstanding that obvious and sole purpose for the 2014 Plan amendment, the Committee "interpreted" the amendment as only applying to the dollar limit adjustments (first prong) and not the final average compensation adjustments (second prong), even though the former were already set forth in the Plan before the 2014 amendment.

130. This arbitrary and capricious interpretation was clearly intended to deny Plaintiff West his full pension benefit that the Committee admitted was due to Plaintiff because of their prior benefit miscalculation made only 60 days earlier. As an aside, Plaintiff West is a former President of the Union and has had various skirmishes with the Commissioner over his forty-year career with MLB.

131. The Committee suggested that the reference to "$255,000 for 2013" in the Plan amendment evidenced an intent not to allow the cost-of-living adjustments that the 2014 Plan amendment clearly added. That suggestion is disingenuous. That parenthetical reference merely cites the maximum dollar amount of compensation that can be considered under Code Section 401(a)(17) for 2013, before the application of COLA adjustments described in the cited regulation. The dollar limit under Code Section 401(a)(17) was much higher than $255,000 in 2022, and the Plan amendment does not adjust the dollar limit under Code Section 401(a)(17), it adjusts the final average compensation figure for participants who receive a pension in a year after the year they actually stop receiving compensation from employment. There was no need for the 2014 Plan amendment to include any of the highlighted language in Paragraph 123 above, if the Plan was not adding the cost-of-living adjustments for the final average compensation prong of the Section 415(b) limit.

132. The Committee also suggested that the 2014 Plan amendment could not be intended to allow an adjustment to the 401(a)(17) dollar limit for any year because that could make the dollar limit different for that year for one participant but not another participant. That is not accurate. The regulation is not allowing an adjustment to Code Section 401(a)(17) compensation limits, it is allowing an adjustment to the final average compensation figure derived from applying those dollar limits to a given participant who receives his pension after the final year of his employment. The adjustment to the final average compensation figure is the exact purpose of Treasury Regulation § 1.415(d)-1(a)(2) which is cited in Plaintiff's April 26, 2023 letter. The heading for that regulation is "Determination of adjusted limit." The COLA adjustment only applies to a participant receiving his pension benefit in a subsequent year (after his compensation has stopped due to retirement). It is an adjustment to the Code Section 415 benefit limit, not the

Code Section 401(a)(17) compensation limit. A Section 415 COLA adjustment for one participant does not apply to any other participant and is not an adjustment to the Section 401(a)(17) dollar limit. A plan sponsor either adopts the COLA adjustment for the benefit of its participants or does not. This Plan (along with 95% of all other pension plans) clearly adopted the COLA adjustment provision, so that participants would not forfeit earned pension benefits due to a plan sponsor's failure to take advantage of the COLA adjustment available under the regulation.

133. The 2014 Plan amendment had been requested by the IRS to clarify the Plan's provisions for applying Code Section 415 limits. The Committee submitted that Plan amendment to the IRS as a condition for receiving a favorable determination letter from the IRS on minimum required Plan compliance language. It would be arbitrary and capricious to provide a formal Plan amendment to the IRS to clarify the Plan's application of Section 415 limits, then interpret that same amendment as if it had no impact on the Plan.

134. It is normally understood that a Plan amendment will be construed in a manner assuming the amendment was intended to have meaning and was not intended to have no meaning.

135. Hence, the only reasonable interpretation of the highlighted portion of the Plan amendment (especially the words "as adjusted pursuant to") is to enforce its obvious purpose, to benefit Plan participants who are eligible for a slightly higher benefit limit if their payout occurs after the year in which their compensation ceases. This cost-of-living adjustment is intended to protect participants from the inflationary dilution of their pension benefit when they retire in one year but commence their pension in a later year. Such increases are expressly permitted and calculated pursuant to applicable IRS regulations. All participants are treated the same.

136. The clearly improper interpretation of the 2014 Plan amendment described above is ironic in light of the Committee's admission that it underpaid the Plaintiff by nearly $150,000

to begin with, due to its own calculation mistake. The total calculation shortfall may actually be greater if Plaintiffs succeed with any of the other claims in this Complaint. Further, the cost-of-living adjustment provision added to the Plan in 2014 may help other participants receive all of the pension benefit they earned under the Plan, as the regulation expressly permits.

**COUNT I – CLAIM FOR BENEFITS PURSUANT TO SECTION 502(a)(3) OF ERISA - The Broken Benefit Table Under Column B Violates Code Section 411 and Must Be Reformed**

137. Plaintiff repeats, reaffirms and realleges paragraphs 1-136 of this Complaint as if they were fully restated at length herein.

138. The Benefit Table under Column B, as is partially illustrated in Paragraph 35, reduces a participant's accrued benefit every year from age 62 to age 65, which is a clear violation of Sections 204(b)(1)(G) and (H) of ERISA, Sections 411(b)(1)(G) and (H) of the Code, and Treasury Regulation Section 1.411(b)-1(d)(3).

139. Those statutory and regulatory provisions do not allow a participant's accrued benefit to be reduced or frozen on account of an increase in age. It should be noted that the $170,000 benefit amount from age 62-65 for other forms of payment (as is illustrated in tables under Paragraphs 45 and 60), are not statutorily imposed. Instead, they are imposed by the Plan's unique design, borrowing the Code Section 415 limits from 2005. The actual Code Section 415 limits increased shortly after 2005 and have been greater than $170,000 for more than twenty years.

140. The Committee's "defense" that those reduced accrued benefit amounts are not prohibited because the amounts are actuarially equivalent to $170,000 is irrelevant. The $170,000 benefit level relates to benefits paid in a different form of payment, and actuarial equivalence to a different form of payment which is not being paid under the Column B Benefit Table does not "cure" the defect in the Column B Benefit Table. The accrued benefit for all participants who could

someday elect to commence their benefit in the form of payment covered by the Column B Benefit Table were unlawfully reduced.

141. Since the Committee is not permitted to enforce a Benefit Table which violates the Code under Plan Section 11.10 or applicable law, the Column B Benefit Table must be equitably reformed to bring it into compliance with the Code and ERISA.

142. The most logical method for reforming the broken Benefit Table to comply with the Code and ERISA is to simply change the normal form of payment under the Plan from 2005-present to a single life annuity (with no ten-year certain feature) for unmarried participants and to a 100% joint and survivor annuity (with no ten-year certain feature) for married participants. If a participant wants to receive a form of payment which includes a ten-year certain feature, his benefit amount can be reduced if so directed by the participant. His accrued benefit under the reformed Plan would be the single life annuity amount, not the reduced ten-year certain feature amount. This reformation will eliminate the violation because the accrued benefit will not decrease and will align the Plan with the normal forms of payment that have already been in place from 2013-present.

WHEREFORE, Plaintiffs pray for the following relief:

A. That the Court enter judgment in favor of Plaintiffs and order the Plan and Committee to (i) reform the Column B Benefit Table and normal forms of payment under the Plan from 2005-present to not contain a ten-year certain feature, (ii) to insert a new Column B Benefit Table which provides the $170,000 level of benefit at age 62 (as adjusted before and after age 62) as is illustrated in Paragraph 45 above, and (iii) to distribute additional pension benefits (plus interest) to affected Plaintiffs in accordance with the reformed Benefit Table as may be required herein.

B. That the Court award Plaintiffs their attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g); and

C. That the Plaintiffs be awarded any and all other relief to which they may be entitled.

**COUNT II – CLAIM PURSUANT TO SECTION 502(a)(1)(B) OF ERISA – Benefit Amounts Must Be Adjusted to Reflect the Form of Payment Elected by the Umpire**

143. Plaintiff repeats, reaffirms and realleges paragraphs 1-142 of this Complaint as if they were fully restated at length herein.

144. The Committee must adjust the benefit amounts paid to Plaintiff umpires to match the form of payment elected by the Plaintiff umpires as is required by Section 6.3 of the Plan.

145. The benefit amounts set forth in the Benefit Table in Column B are only applicable to participants who elected a form of payment with a ten-year certain feature. None of the Plaintiff umpires (and very few if any other umpires) have elected such a form of payment. Nonetheless, the Committee has paid benefits to various participants, including some or all Plaintiffs, using this Benefit Table in error.

146. The benefit amounts due to participants who elected a single life annuity without a ten-year certain feature or who elected a 100% joint and survivor annuity without a ten-year certain feature are entitled to much higher benefits than those set forth in the broken Column B Benefit Table.

147. For example, Plaintiff Davis received a pension benefit (prior to a QDRO offset) of $194,447 under the broken Column B Benefit Table, even though he clearly elected a 100% joint and survivor benefit with no ten-year certain feature. He should have received a pension benefit (prior to the QDRO offset) of $213,221 (see table at Paragraph 45). Umpire Davis was assessed a 10-year certain form of payment benefit reduction, when he did not elect a form of payment with a ten-year certain feature.

148. Plaintiff Davis's benefit was also calculated as if he was age 68 at pension commencement, when he had attained age 69 by the time of his pension commencement. The Committee mislead Plaintiff Davis by telling him he could commence his pension effective as of two months prior to his 69th birthday without losing any pension benefits, then paid his age 68 benefit rather than his age 69 benefit.

149. As such, Plaintiff Davis was paid using the wrong form of payment and the wrong attained age at pension commencement.

150. Plaintiff Davis was also offered a benefit with a ten-year certain feature that had been actuarially reduced for that feature twice.

151. Lastly, Plaintiff Davis was told by the Committee that he received a 100% joint and survivor benefit with a ten-year certain feature during his administrative review process, when he had clearly not elected that ten-year certain feature. In fact, the Committee sent Plaintiff Davis a letter dated February 15, 2022 describing his correct form of payment. So, the Committee contradicted itself during the administrative review process.

WHEREFORE, Plaintiffs pray for the following relief:

A. That the Court enter judgment in favor of Plaintiffs and order the Plan and Committee to distribute additional pension benefits (plus interest) to affected Plaintiffs in accordance with the form of payment elected by each Plaintiff under Section 6.3 of the Plan.

B. That the Court award Plaintiffs their attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g); and

C. That the Plaintiffs be awarded any and all other relief to which they may be entitled.

**COUNT III – CLAIM FOR BENEFITS PURSUANT TO SECTION 502(a)(1)(B) OF ERISA – Improper Calculation of Benefits Under Optional Forms of Payment**

152. Plaintiff repeats, reaffirms and realleges paragraphs 1-151 of this Complaint as if they were fully restated at length herein.

153. In those cases where the Committee is required to pay benefits which do not include a ten-year certain feature from age 66-70, the Committee must recalculate the benefit to assure the amount is consistent with the maximum benefit allowed under Code Section 415 in 2005 from age 66-70, as is set forth in Subsection 5.1(a) of the 2005 Plan Restatement.

154. The Committee has used incorrect values for benefits without a ten-year certain feature, from ages 66-70 for some umpires.

155. For example, for one participant (not a Plaintiff herein yet) who was 70 years of age on his pension commencement date, the Committee calculated his single life annuity amount (without a ten-year certain feature) as being $20,046/month or $240,553/per year. However, the maximum benefit payable under Code Section 415 in 2005 at age 70 was nearly $250,000/per year. See the dollar amounts illustrated in the table at Paragraph 45 above.

156. Restated, the broken Column B Benefit Table not only has unlawful amounts from age 62-65, it also has incorrect (too low) amounts from age 66-70, because those amounts are not actuarially equivalent to the maximum benefit allowed under Code Section 415 in 2005 at those ages.

WHEREFORE, Plaintiffs pray for the following relief:

A. That the Court enter judgment in favor of Plaintiffs and order the Plan and Committee to distribute additional pension benefits (plus interest) to affected Plaintiffs in accordance with the maximum benefit allowable under Code Section 415 in 2005, at ages 66-70.

B. That the Court award Plaintiffs their attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g); and

C. That the Plaintiffs be awarded any and all other relief to which they may be entitled.

**COUNT IV – CLAIM FOR BENEFITS PURSUANT TO SECTION 502(a)(1)(B) OF ERISA – Committee Cannot Apply an Administrative Practice Which Distorts an Umpires' Attained Age at Pension Commencement**

157. Plaintiffs repeat, reaffirm and reallege paragraphs 1-156 of this Complaint as if they were fully restated at length herein.

158. As is set out in Paragraphs 69 through 75 above, the Committee engaged in an undisclosed "administrative practice" to delay the effective date of umpire birthdays when calculating their pension benefits, which practice was not set forth anywhere in the Plan document, any SPD or any other pertinent document.

159. The administrative practice was (i) not in compliance with the Plan document as the practice was not set forth in the Plan document or anywhere else, (ii) directly contrary to the nine (9) Benefit Tables all of which provided benefit amounts at the attained age of the participant at pension commencement, and (iii) directly contrary to the rules of Code Section 415 which uses a participant's attained age for determining his maximum benefit amount, which rules were incorporated by reference in Subsection 5.1(a) of the 2005 Plan Restatement. Consequently, the Plan benefits must be paid in accordance with the Plan terms without consideration of an unwritten "administrative practice."

160. The 2000 Benefit Table at Schedule A-1 clearly describes the age column as the age at benefit commencement. For reasons unknown, all subsequent Benefit Tables omitted this clarification, but the references to age are clearly to attained ages under the Plan's design.

161. For example, Plaintiff Hallion commenced his pension effective November 30, 2022. Plaintiff Hallion was 66 years old on his pension commencement date. As such, his benefit amount should have been $183,169/year under the table set forth at Paragraph 45 (with no ten-year certain feature), but the Committee paid $170,000, the age 65 benefit instead.

162. Plaintiff Layne suffered from the same calculation mistake.

WHEREFORE, Plaintiffs pray for the following relief:

A. That the Court enter judgment in favor of Plaintiffs and order the Plan and Committee to distribute additional pension benefits (plus interest) to affected Plaintiffs in accordance with each umpire's attained age at his pension commencement date.

B. That the Court award Plaintiffs their attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g); and

C. That the Plaintiffs be awarded any and all other relief to which they may be entitled.

**COUNT V – CLAIM FOR BENEFITS PURSUANT TO SECTION 502(a)(1)(B) OF ERISA – Actuarial Increases Must Be Added to Benefit Payments Under Plan Section 6.2(a)(iii)(B)**

163. Plaintiff repeats, reaffirms and realleges paragraphs 1-162 of this Complaint as if they were fully restated at length herein.

164. Plan Section 6.2(a)(iii)(B) and Code Section 411 require the payment of actuarial increases for deferred commencements after a participant's normal retirement age.

165. These actuarial increases are required by Code Section 411, including Code Section 411(c)(3), to avoid an impermissible forfeiture of accrued benefits for the time value of their money upon a deferred commencement after their normal retirement age.

166. The suspension of benefits notice exception to these requirements does not apply to any of the Plaintiffs in this case, as is described for multiple reasons in Paragraphs 76 through 111 above.

167. The normal retirement age under the Plan was age 62 (or age 60) during the relevant time period of these claims, and was not age 55, rendering any suspension notice provided at age 55 null and void.

WHEREFORE, Plaintiffs pray for the following relief:

A. That the Court enter judgment in favor of Plaintiffs and order the Plan and Committee to distribute additional pension benefits (plus interest) to affected Plaintiffs in accordance with Section 6.2(a)(iii)(B) of the Plan and Code Section 411.

B. That the Court award Plaintiffs their attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g); and

C. That the Plaintiffs be awarded any and all other relief to which they may be entitled.

**COUNT VI – CLAIM FOR BENEFITS PURSUANT TO SECTION 502(a)(1)(B) OF ERISA – Incorrect Calculation of Code Section 415 Maximum Benefit Limit for Lump-Sum Payouts**

168. Plaintiff repeats, reaffirms and realleges paragraphs 1-167 of this Complaint as if they were fully restated at length herein.

169. Plaintiff West elected and received a lump-sum payout from the Plan in 2022, but the amount of such payout was incorrect (too low) as admitted by the Committee in a letter to Plaintiff West dated March 27, 2023.

170. The Committee informed Plaintiff West he was entitled to an additional $144,019.76, but refused to pay that full corrective payment to him due to a faulty calculation of Plaintiff West's maximum benefit amount under Code Section 415 for 2022.

171. As is described in Paragraphs 121 through 136 above, the Committee's calculation of the benefit limit under Code Section 415 was not in conformance to the terms of the Plan as amended in 2014.

172. More specifically, the Plan was amended in 2014 to include a cost-of-living increase in Plaintiff West's final average compensation under Code Section 415(b) for purposes of calculating his maximum benefit limit under the Code.

173. The Committee ignored or misinterpreted the meaning of the 2014 Plan amendment in an arbitrary or capricious manner, contrary to the clear wording, intent and sole purpose of the amendment.

174. As a result, Umpire West was deprived of his full lump-sum benefit amount under the Plan.

WHEREFORE, Plaintiffs pray for the following relief:

A. That the Court enter judgment in favor of Plaintiffs and order the Plan and Committee to distribute additional pension benefits (plus interest) to Plaintiff West in accordance with Section 5.7(b) of the Plan as amended in 2014.

B. That the Court award Plaintiffs their attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g); and

C. That the Plaintiffs be awarded any and all other relief to which they may be entitled.

/s/ Mark DeBofsky
Attorney for Plaintiff

Mark D. DeBofsky
DeBofsky Law Ltd.
2 N. Riverside Plaza, Suite 1420
Chicago, Illinois 60606
(312) 561-4040
mdebofsky@debofsky.com

Paul Holmes
Williams Barber Morel
Willis Tower, 233 S. Wacker Dr., Suite 6800
Chicago, Illinois 60606
(312) 443-3200
pbh@williamsbarbermorel.com